## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL BENANTI,

               Plaintiff,

     v.

CITIZENS FINANCIAL GROUP, INC.,
et al.,

               Defendants.

CIVIL ACTION NO. 3:19-CV-02162

(MEHALCHICK, M.J.)

## MEMORANDUM

This is a civil rights action initiated upon the filing of the Complaint by *pro se* Plaintiff Michael Benanti ("Benanti") on December 17, 2019. (Doc. 1). In his six-count Amended Complaint, Benanti asserts claims under 42 U.S.C. § 1983 and state law against the following Defendants: Citizens Financial Group and Citizens Bank of Pennsylvania ("Citizens"); John Scott, a member of the litigation group employed by Citizens; Lorissa Harris, a member of the Office of the Chairman at Citizens; Nicole Ferrante, a member of the Office of the Chairman at Citizens; Jennifer Cotes, an employee of Citizens; John Doe employees of Citizens; David Lewen, a federal prosecutor in the Eastern District of Tennessee; Mick Nocera, an FBI Special Agent in Knoxville, Tennessee, and John Doe law enforcement personnel. (Doc. 34, ¶¶ 5-13). Now pending before the Court is a Motion to Dismiss the Amended Complaint filed by Citizens, Cote, Ferrante, Harris, and Scott (collectively, the "Citizens Defendants"). (Doc. 37). For the reasons stated herein, it is recommended that the Motion to Dismiss be **GRANTED**.

## I. BACKGROUND

The following recitation of facts are taken from those alleged in Benanti's Amended Complaint, which was filed on October 15, 2020. (Doc. 34). From 2008 to 2015, Benanti owned and operated two prisoner service companies which provided rehabilitation and re-entry services. (Doc. 34, ¶ 15). These companies were called Prisoner Assistant (PA) and Lifetime Liberty Group (LLG). (Doc. 34, ¶ 15). In January 2015, Benanti founded LLG. (Doc. 34, ¶ 16). Citizens Bank subsequently agreed to open dozens of accounts under Benanti's name. (Doc. 34, ¶ 16).

On November 25, 2015, Benanti was arrested and indicted in the Eastern District of Tennessee for bank robbery and related offenses. (Doc. 34, ¶ 16). In May 2016, Defendants Lewen, Nocera, and John Doe law enforcement members released extra-judicial statements to the public on a government website prior to Benanti's trial. (Doc. 34, ¶ 17). The statements contained opinions about Benanti's guilt, observations of his character, and allegations of uncharged conduct. (Doc. 34, ¶ 17). Because of these statements, articles were written alleging that Benanti's companies were fraudulent, that Benanti stole from these companies, that Benanti robbed banks to replace funds he took from the companies' accounts, and that Benanti murdered his partner to cover up his crimes. (Doc. 34, ¶ 18). These statements were provided to Citizens and unknown Citizens employees by Defendants Lewen, Nocera, and John Doe law enforcement personnel between February 2016 and February 2017. (Doc. 34, ¶ 23).

In July and August 2016, two LLG clients attempted to have their payments returned. (Doc. 34, ¶¶ 24-26). One of the clients contacted Benanti, who directed Travelers to perform the refund. (Doc. 34, ¶¶ 24-25). The other client, Kenneth Doolin, informed Benanti that he

had asked for the refund directly from Travelers. (Doc. 34, ¶ 26). Travelers did not update Benanti on the status of either of these requests. (Doc. 34, ¶¶ 25-26). On August 29, 2016, Doolin corresponded with Defendant Ferrante who agreed to pay Doolin $6,399.56 from Benanti's accounts. (Doc. 34, ¶ 31). Ferrante did not attempt to contact Benanti to seek permission to withdraw funds from his accounts. (Doc. 34, ¶ 31).

In July and August 2016, Defendants Lewen, Nocera, and John Doe law enforcement personnel intercepted mail sent from Benanti to his attorney, his aunt, and a friend. (Doc. 34, ¶ 28). The mail was then copied and distributed to Citizens. (Doc. 34, ¶ 28). In so doing, Lewen, Nocera, and John Doe law enforcement personnel spread "the unsupported allegations" regarding Benanti's fraudulent business and the murder of his partner. (Doc. 34, ¶ 28).

On August 8, 2016, Citizens and unknown Citizens employees withdrew a total of $10,277.70 from Benanti's accounts with a debit memo to close via email. (Doc. 34, ¶ 30). Later that month, Benanti's attorney presented a power of attorney to Citizens Bank, but its employees refused to provide him any information. (Doc. 34, ¶ 33). On September 6, 2016, Benanti's aunt and friend were "visited" by Defendants John Doe law enforcement personnel. (Doc. 34, ¶ 34). The law enforcement personnel informed Benanti's aunt that "the funds were 'illegally obtained' and threatened her that she could be in trouble if she attempted to access them." (Doc. 34, ¶ 34). Defendants Lewen, Nocera, and John Doe law enforcement personnel had no evidence of illegally obtained funds being deposited in the accounts, nor were Citizens and John Does Citizens employees able to identify the same. (Doc. 34, ¶ 35).

There was no legal process or claim of forfeiture of funds served on Citizens and Citizens employees by the government related to Benanti's criminal case. (Doc. 34, ¶ 36). On

October 5, 2016, Citizens and John Doe Citizens employees withdrew $6,662.77 without obtaining authorization or notifying Benanti. (Doc. 34, ¶ 37). On November 25, 2016, Citizens and John Doe Citizens employees withdrew $2,875.19 without obtaining authorization or notifying Benanti. (Doc. 34, ¶ 38). On December 16, 2016, Citizens and John Doe Citizens employees withdrew $42,566.10 without obtaining authorization or notifying Benanti. (Doc. 34, ¶ 39).

On January 3, 2017, Benanti submitted a second power of attorney, assigning Chelsea Moore authority to communicate with Citizens and John Doe Citizens employees on Benanti's behalf. (Doc. 34, ¶ 40). Moore was denied access to the account information necessary for Benanti to prepare for trial. (Doc. 34, ¶ 40). Defendants Lewen, Nocera, and John Doe law enforcement conspired with Defendants Citizens and John Doe Citizens employees to block Benanti from accessing his account information. (Doc. 34, ¶ 41). Defendants Lewen, Nocera, and John Doe law enforcement conspired with Defendants Citizens and John Doe Citizens employees about allowing power of attorney access to Benanti's accounts between February 1, 2016, and February 14, 2017. (Doc. 34, ¶ 42). Between February 2016 and February 2017, Defendants Citizens, Ferrante, and John Doe Citizens employees confiscated, transferred, distributed, or otherwise deprived Benanti of the funds held in accounts under his authority without notice. (Doc. 34, ¶ 44). Defendants Citizens, Scott, Harris, Ferranti, Cotes, and John Doe Citizens employees failed to notify Benanti of a dispute or investigation, claim, or process of any kind between February 2016 and February 2017. (Doc. 34, ¶ 45).

Between February 2016 and February 2017, Defendants Lewen, Nocera, and John Doe law enforcement told Citizens and John Doe Citizens employees that Benanti deposited

bank robbery money into his accounts held at Citizens, that he stole money from his clients and/or accounts, and that he murdered Natasha Bogoev. (Doc. 34, ¶¶ 46-48). This was a conspiracy to create, reveal, or otherwise find motive for Benanti to rob banks. (Doc. 34, ¶ 49).

On January 6, 2017, Defendant Lewen served a subpoena on Citizens concerning Benanti's accounts with direction to respond to Defendant Nocera. (Doc. 34, ¶ 50). On January 10, 2017, Defendant Cotes responded to the subpoena on behalf of Citizens without notifying Benanti. (Doc. 34, ¶ 51). On February 14, 2017, Benanti was convicted in criminal case number 3:15-CR-177. (Doc. 34, ¶ 52). In July 2017, Benanti was sentenced and transported to Atwater, California, for the service of his sentence. (Doc. 34, ¶ 53).

Between October and December 2017, Benanti corresponded with Defendant Harris, requesting account statements and inquiring about accounts. (Doc. 34, ¶ 54). Harris responded on November 14, 2017. (Doc. 34, ¶ 54). On December 21, 2017, Harris informed Benanti of portions of the account agreement related to fraudulent or illegal activity, their right to make payment to third parties involved in disputes, and their right to set off and close an account. (Doc. 34, ¶ 55). Harris refused to provide details, but informed Benanti that the accounts were closed with a negative balance, otherwise ignoring Benanti's questions and concerns. (Doc. 34, ¶ 55).

On January 2, 2018, Benanti disputed the account activity from November 25, 2015, until January 2, 2018 as fraudulent, and requested an investigation, account statements, and a record of the transactions, specifically who was paid what. (Doc. 34, ¶ 56). On February 21, 2018, John Scott of Citizens Litigation Group responded with final statements from when the accounts were closed. (Doc. 34, ¶ 57). Scott refused to answer questions or provide

information on the notification of dispute or alleged fraud enclosed in those statements. (Doc. 34, ¶ 57). No PA or LLG client had a balance of $42,566.10. (Doc. 34, ¶ 58).

On June 19, 2018, Benanti asked Scott a series of questions regarding his account activity, as well as for supporting documents. (Doc. 34, ¶ 59). On July 16, 2018, Harris responded for Citizens with the remainder of Benanti's requested account statements. (Doc. 34, ¶ 60). Between July 16 and September 17, 2018, Benanti contacted the Office of the Chairman at Citizens via phone call. (Doc. 34, ¶ 61). A John Doe Citizens employee refused to provide specific information on the transactions and told Benanti to contact the United States Attorneys office or the FBI for more information and that actions on the account were within Citizens legal rights and made in conjunction with a law enforcement investigation. (Doc. 34, ¶ 61). On September 17, 2018, Benanti requested written results of an investigation from Harris and Scott. (Doc. 34, ¶ 62). Benanti informed them that he was not charged or convicted of any crime related to Citizens Bank accounts held by Benanti and that the federal and state authorities did not confiscate or initiate forfeiture procedures. (Doc. 34, ¶ 62). Benanti requested emails, reports, and reasons for unauthorized actions on his accounts and that the issue be resolved. (Doc. 34, ¶ 62). On October 11, 2018, Harris refused to provide Benanti with any information except for the requested statements. (Doc. 34, ¶ 63).

On December 18, 2018, Benanti wrote Scott a letter which was received on December 21, 2018. (Doc. 34, ¶ 64). Benanti requested his entire case file, disputed all actions taken on the accounts after November 25, 2015, and advised Scott that he had received information about Citizens Bank working with the FBI and prosecutor's office in an effort to conceal evidence and obstruct justice. (Doc. 34, ¶ 64). Benanti requested a letter admitting the funds in the account exceeded any legitimate claims against it, along with records of communication

between Citizens and the government. (Doc. 34, ¶ 64). Benanti placed Citizens and Scott on notice of impending suit should they not attempt to resolve the issues. (Doc. 34, ¶ 64).

Defendants know that no unaccounted funds were deposited into any of Benanti's accounts, thus they conspired to support a motive for bank robbery. (Doc. 34, ¶ 65). Defendants know that the amount of money left in Benanti's bank accounts exceeded his clients' claims or any legitimate claim made on the accounts, demonstrating no theft. (Doc. 34, ¶ 66). Defendants Citizens and John Doe Citizens employees deprived Benanti of approximately $100,000.00 that was on deposit in Citizens Bank. (Doc. 34, ¶ 69).

Benanti brings claims of breach of contract; conspiracy to deprive him of his Fourth, Fifth, and Fourteenth Amendment rights; fraud; unjust enrichment; "bad faith"; violation of privacy; and violation of the Right to Financial Privacy Act (RFPA). (Doc. 34, ¶¶ 70-119). Citizens Defendants filed their Motion to Dismiss on December 7, 2020. (Doc. 37). This motion is fully briefed and is ripe for disposition. (Doc. 38; Doc. 44; Doc. 48).

## II.  MOTION TO DISMISS STANDARD

Defendants seek to dismiss the Complaint under Rules 12(b)(1) – for lack of subject matter jurisdiction – and 12(b)(6) – for failure to state a claim – of the Federal Rules of Civil Procedure. (Doc. 38). A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. *Gould Electronics Inc. v. United States,* 220 F.3d 169, 176 (3d Cir. 2000). In a factual attack under Rule 12(b)(1), the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction. *Gould Electronics Inc.,* 220 F.3d at 178. This 12(b)(1) factual evaluation may occur at any stage of the proceedings, from the time the answer has been served until after the trial has been completed. *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891–92 (3d Cir. 1977).

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In re Corestates Trust Fee Litig.,* 837 F.Supp. 104, 105 (E.D. Pa. 1993), *aff'd* 39 F.3d 61 (3d Cir. 1994).

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions which are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the required elements which make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions…'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting

*re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). The court also need not assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan*, 20 F.3d at 1261. This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

Additionally, Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Thus, a well-pleaded complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation, set forth in a "short and plain" statement of a cause of action. There is no requirement that the pleading be specific or probable. *Schuchardt*, 839 F.3d at 347 (*citing Phillips v. County of Allegheny*, 515 F.3d at 224, 233-234 (3d Cir. 2008). Rule 8(a) requires a "showing that 'the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551

U.S. 89, 93-94 (2007) (quoting Fed. R. Civ. P. 8(a)(2)); *see also Phillips*, 515 F.3d at 233 (citing *Twombly*, 550 U.S. at 545).

With the aforementioned standards in mind, a document filed *pro se* is "to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Nonetheless, *pro se* plaintiffs are still subject to the basis pleading requirements of Rule 8. *Rhett v. New Jersey State Superior Court*, 260 F. App'x 513 (3d Cir. 2008). The Third Circuit has further instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

## III.  DISCUSSION

Citizens Defendants submit that Benanti lacks standing so his Complaint should be dismissed for lack of subject matter jurisdiction. (Doc. 38, at 10). Citizens Defendants state that the damages alleged in the Complaint arise from loss of funds from a bank account which belonged to LLG, not Benanti. (Doc. 38, at 12). Benanti's "claims fail because he cannot prove that ***he*** has personally or individually suffered an injury in fact that is separate or distinct from his businesses." (Doc. 38, at 12) (emphasis in original). The only bank account identified in the Complaint is opened in the name of LLG and Benanti does not have standing to assert direct claims on behalf of his companies, according to Citizens Defendants. (Doc. 38, at 11-12).

Benanti responds that Defendants erroneously confine his claims to one account. (Doc. 44, at 4). Benanti submits that he does not identify a specific account to which his claims are limited and does not limit his claims to one account. (Doc. 44, at 4). Quoting his Complaint, Benanti asserts that he "clearly states 'dozens of accounts' were opened 'under the plaintiff's name.'" (Doc. 44, at 4). [1]

The standing doctrine is a threshold inquiry to adjudication, which defines and limits the role of the judiciary. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It is well settled that unless a plaintiff has standing, a federal district court lacks subject-matter jurisdiction with respect to the merits of the case. A plaintiff bears the burden of establishing three elements in order to invoke federal jurisdiction: injury, causation, and redressability. Specifically:

> [ (1) ]The plaintiff must have suffered an injury in fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent [;(2) ]the plaintiff must establish a causal connection between the injury and the conduct complained of[; and (3) ] the plaintiff must establish that it is likely, as opposed to merely speculative, that the injury will be "redressed by a favorable decision."

> *In re McNeil Consumer Healthcare,* 877 F. Supp. 2d 254, 269 (E.D. Pa. 2012) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).

"[T]he Court of Appeals for the Third Circuit recently held that a district court must apply a "plausibility" standard when analyzing whether the factual allegations of a complaint, taken as true, show that the plaintiff possesses Article III standing." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action,* 678 F.3d 235, 244 (3d Cir. 2012).

---

[1] Any injury relating to Benanti's conviction shall not be considered here because claims which would implicitly invalidate the legitimacy of a conviction must be brought in a petition for *habeas corpus*. (Doc. 44, at 3); *see Heck v. Humphrey,* 512 U.S. 477, 487 (1994).

A plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties. *Warth v. Sedin*, 422 U.S. 490, 498 (1975). The "derivative injury rule" "holds that a shareholder (even a shareholder in a closely-held corporation) may not sue for personal injuries that result directly from injuries to the corporation." *In re Kaplin*, 143 F.3d 807, 811-12 (3d Cir. 1998). The corporate veil cannot be pierced by the shareholder seeking to sue for the company's losses. *KBT Corp. v. Ceridian Corp.*, 966 F.Supp. 369, 373 (E.D. Pa. 1997). Only injuries suffered by the shareholder personally, rather than in the corporation's name, can be remedied in a lawsuit brought by the shareholder. *In re Kaplan*, 143 F.3d at 812; *Scanlin v. TD Waterhouse Inc.*, No. 4:05-CV-02458, 2006 WL 3484353, at *1-2 (M.D. Pa. Nov. 30, 2006) (holding that a plaintiff lacked standing when he was the founder and sole "funder" of a non-profit corporation and brought claims arising from a transaction between the defendants and the corporation).

After examining the Complaint's allegations and attached exhibits, the Court finds that Benanti does not have standing. *See In re Schering Plough Corp. Intron/Temodar Consumer Class Action,* 678 F.3d 235, 244 (3d Cir.2012). The plausibility standard, as articulated in *Iqbal*, requires the "reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. For relief, Benanti seeks "actual damages of approximately $100,000," as well as putative damages. (Doc. 34, at 22). The $100,000 in actual damages comes from the amount of money "on deposit in Citizens Bank" of which Benanti was "deprived." (Doc. 34, at 13). The material provided by Benanti establishes that the accounts at issue in this lawsuit were in the names of Benanti's corporations and not Benanti personally. (Doc. 34).

First, in response to Benanti's inquiry "about accounts and why was access to *my accounts* blocked," Defendant Harris responded that "your recent correspondence regarding

*Lifetime Liberty Group* was forwarded to the Office of the Chairman for review and response." (Doc. 34, at 10, 64) (emphases added). This begins a long string of correspondence and evidence in which Benanti: (i) does not inquire into "some" or a portion of his accounts, but rather inquires into "my accounts" signifying that all of his accounts are at issue; (ii) receives responses regarding *only* bank accounts under LLG or PA, not under his name personally; and (iii) does not inquire further into any additional accounts. (Doc. 34). On December 21, 2017, Benanti received another letter from Defendant Harris in response to Benanti's initial inquiry as to "*my accounts*" in which Harris stated that "the Bank has closed all account(s) relating to *Lifetime Liberty Group*." (Doc. 34, at 10, 65) (emphases added). Benanti characterizes this correspondence as informing him that "*the accounts* were closed with a negative balance." (Doc. 34, at 10). If there were additional accounts at issue which were under Benanti's name personally and not one of his companies, he would have likely used a qualifier when describing the accounts that were closed with a negative balance. (*See* Doc. 34, at 10).

The only mention of accounts belonging to Benanti in his personal capacity in any correspondence came in a letter from Defendant Scott to Benanti on February 21, 2018. (Doc. 34, at 66). In this letter, Scott stated that he was writing in response to Benanti's letter "concerning the status of the Lifetime Liberty Group accounts, Prisoner Assist Inc. accounts, and your personal accounts with the Bank (collectively, the 'Accounts')." (Doc. 34, at 66). However, Scott proceeded to state that "enclosed herewith are the final statements for *all of the Accounts*." (Doc. 34, at 66) (emphasis added). According to Benanti, these statements "reflected a total of $62,000," and involved a bank account ending in 7842. (Doc. 34, at 11,

50, 60-62). This bank account was under Lifetime Liberty Group – Main Account. (Doc. 34, at 50, 60-62).

Not satisfied with this response, Benanti wrote back to Scott on June 19, 2018, in which he explained that the statements sent by Scott

> tell me little to nothing in actuality. I request all statements for the months of and between November 2015 till [sic] each account closed for the following accounts.
>
> 623424-790-7 Prisoner Assistant Main Account Payable
>
> 623424-784-2 Lifetime Liberty Group – Main Account
>
> 630218-780-3 Lifetime Liberty Group – Receivable Pay
>
> I gave no permission to withdraw any funds from any account after December 2, 2015. I think that from those statements I can see the records of all transactions which will help me to better understand what happened here.

(Doc. 34, at 68).

The only accounts sought by Benanti were those belonging to LLG and PA. (Doc. 34, at 68). Benanti said that acquiring these statements would allow him to see the records of *all* transactions and clarify what occurred. (Doc. 34, at 68). If there were personal accounts at issue, common sense says that Benanti would have requested account statements from those under his name. *See Iqbal*, 556 U.S. at 679 (explaining that the plausibility standard requires the "reviewing court to draw on its judicial experience and common sense"). The fact that all transactions would be illuminated by Benanti's receipt of only PA and LLG account statements demonstrates that there is no personal Benanti account at issue. Furthermore, in the letter sent on June 19, 2018, Benanti stated that "[*a*]*ll accounts held at Citizens* were held *in corporations* under my name and legally my property." (Doc. 34, at 67) (emphases added). This is a direct factual allegation which, taken as true, precludes Benanti from filing suit in

his personal capacity for any claim arising from any account held at Citizens. *See In re Kaplan*, 143 F.3d at 812.

Finally, on July 16, 2018, Harris responded to Benanti's letter of June 19, 2018. (Doc. 34, at 76). According to Benanti, Harris's letter provided "the remainder of the requested account statements." (Doc. 34, at 11-12). The "remaining" accounts at issue ended in 7803, 7907, and 7842. (Doc. 34, at 76). Per Benanti's letter of June 19, 2018, each one of these accounts belonged to one of his corporations. (Doc. 34, at 68).

The correspondence between Benanti and Citizens Defendants establishes that the only interests at issue belong to third-party corporations. (Doc. 34). Benanti's references to "my accounts" address only LLG and PA accounts. (Doc. 34). Benanti makes no inquiry and expresses no concern for any account beyond those belonging to LLG and PA. (Doc. 34). As such, it is clear that Benanti "rest[s] his claim[s] to relief on the legal rights or interests of third parties." *See Warth*, 422 U.S. at 498. Benanti does not have standing to bring suit because he seeks to remedy injuries to LLG and PA rather than to himself. *See In re Kaplan*, 143 F.3d at 812. For this reason, this Court lacks subject matter jurisdiction to hear Benanti's claims. *See Warth*, 422 U.S. at 498; *In re McNeil Consumer Healthcare*, 877 F. Supp. 2d at 269.

## IV. LEAVE TO AMEND

The Third Circuit has instructed district courts to permit a curative amendment if a complaint is vulnerable to dismissal for failure to state a claim, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Here, such amendment would be futile. Benanti has established through the correspondence that he has put on the record that only LLG and PA bank accounts are at issue. (Doc. 34). Throughout the lengthy correspondence between Travelers representatives and Benanti, there

is virtually no mention or reference to any personal account. (Doc. 34, at 50-73). It would be futile to prolong this case when such evidence shows that Benanti was disputing only LLG and PA bank accounts. (Doc. 34). As such, leave to amend shall not be granted.[2]

## V. CONCLUSION

Based on the foregoing, Travelers Defendants' Motion to Dismiss is **GRANTED**. (Doc. 37). Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.[3] Plaintiff's Motion to Order Clerk to Serve New Defendants and Motion to Appoint Counsel are **DISMISSED AS MOOT**. (Doc. 40; Doc. 45). The Clerk of Court is directed to **CLOSE THIS MATTER**.

An appropriate Order shall follow.

BY THE COURT:

Dated: June 28, 2021

s/ Karoline Mehalchick

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

---

[2] Benanti cannot amend the caption and proceed on behalf of his corporations because he is not an attorney and so cannot represent his corporations. *Simbraw, Inc. v. United States,* 367 F.2d 373, 373-74 (3d Cir. 1966) (an attorney must appear for a corporation in litigation).

[3] "Dismissal for lack of standing reflects a lack of jurisdiction, so dismissal … should [be] without prejudice." *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 896 (3d Cir. 2020).